464 A.2d 460

**John FINKLEA, Appellant,**

**v.**

**Habib TONSEY; the Budd Company.**

Superior Court of Pennsylvania.

Argued April 7, 1983.

Filed Aug. 12, 1983.

554

Richard A. Ash, Philadelphia, for appellant.

Charles W. Craven, Philadelphia, for appellees.

Before SPAETH, WIEAND and HOFFMAN, JJ.

SPAETH, Judge:

This is an appeal from a judgment entered in a trespass action. The parties to the action are John Finklea, plaintiff below and appellant here, and The Budd Company and Dr. Habib Tonsey, defendants below and appellees here. Mr. Finklea was an employee of Budd, and Dr. Tonsey was Budd's medical director. On Dr. Tonsey's recommendation, Mr. Finklea was discharged from his employment on the ground that his use of drugs impaired his ability to perform his job on the assembly line in a safe manner. Mr. Finklea's claim is that in making this recommendation, Dr. Tonsey acted negligently and in the course of his employment as Budd's medical director. The trial judge granted Dr. Tonsey's and Budd's action for a compulsory nonsuit, and a court en banc denied Mr. Finklea's motion to remove the nonsuit, and entered judgment in favor of Dr. Tonsey, and Budd. We have concluded that even when viewed in the light most favorable to Mr. Finklea,[1] the evidence was

1. Appellant has petitioned this court to direct that the record be corrected at 1.29. Since we do not rely upon appellant's opening address to the jury in reaching our decision, we deny the petition.

insufficient to support a finding that Dr. Tonsey was negligent. We therefore affirm.

■ In reviewing the propriety of the order denying appellant's motion to remove the nonsuit, we must view the evidence in the light most favorable to appellant, which means that we must resolve all conflicts in the evidence in appellant's favor, and must give him the benefit of all favorable inferences arising from the evidence. *Scott v. Purcell*, 490 Pa. 109, 415 A.2d 56 (1980) (collecting cases). So viewed, appellant's evidence discloses the following facts.

In July 1975 appellant began to work as a manual laborer for The Budd Company, which "employs a lot of fast-moving big presses and moving machinery ...." R. 2.96; 3.10. Sometime during this first period of employment—the date is not clear from the record—a urinalysis was conducted to determine whether appellant was taking any drugs. R. 2.147. The results of the tests were negative. R. 2.147.

After working some five weeks, appellant was laid off. R. 2.99. Several weeks later, appellant was called back to work, and another urinalysis was conducted. R. 2.100. This time the analysis disclosed the presence of Darvon in appellant's system. R. 2.151. Dr. Tonsey, as Budd's medical director, told appellant that the urinalysis test had revealed the presence of a drug in his system, and asked him to get a note from his doctor stating what kind of medication he was taking. R. 2.130; 2.157–58. Appellant conveyed this request to Dr. Edward Tobe, who had been treating him for physical and emotional problems at the Erie Medical Center from November 1974 through July 1975. R. 2.16–2.17; 2.30. Dr. Tobe gave appellant a note, which stated: "John Finklea has been under my care from 1974 [ ] on and is unable to return to work [ ]. Meds. taken: Elavil 50 mg. Valium 10 mg. Darvoset N 100 mg. one prescription of Biphetamine July, 1975." Dr. Tobe understood that appellant wanted a note stating what kind of medication he was then taking,—*i.e.*, in October 1975. R. 2.16–17; 2.30, 2.99. Nevertheless, appellant argues that the

note described medication prescribed in July 1975, and that the record should be read as consistent with appellant's testimony that he was not then taking the medication described in the note. *See* R. 2.51; 2.59–61; 2.138. We shall consider this argument in some detail later. Appellant delivered Dr. Tobe's note to a third party at The Budd Company, who in turn delivered it to Dr. Tonsey.[2] R. 2.152.

Appellant also asked Dr. Tobe to telephone The Budd Company. Dr. Tobe did, but Dr. Tonsey was not available. When Dr. Tonsey returned Dr. Tobe's call, R. 2.159–60; 3.8, he was told that Dr. Tobe was not available, R. 3.7. When Dr. Tonsey "asked the clinic to talk to a doctor," he was transferred to another person whom he couldn't identify beyond saying that the person had a Spanish name. R. 3.24. The record is unclear as to what this person told Dr. Tonsey. At trial Dr. Tonsey testified that this person "checked [appellant's] chart [and said] that the patient has been receiving various drugs, Valium, Melaril, Elavil, Biphetamines, Darvoset, and some other tranquilizers." R. 3.9. But at his deposition Dr. Tonsey said that he was told that appellant was taking Thorazine and Elavil. R. 3.39. The most favorable interpretation of this conflict, from appellant's point of view, is that Dr. Tonsey was told that he was taking Thorazine. Appellant's medical chart discloses that no Thorazine had been prescribed for him between December 29, 1973, and October 1975. R. 2.31–63. Thus, if the chart is correct, a statement that appellant was taking Thorazine in October 1975 was incorrect. As will be discussed in a moment, one of appellant's arguments is that Dr. Tonsey was negligent in "[speaking] to an entirely unknown person at the clinic who purportedly provided the facts relating to [appellant's] treatment and history." Brief for Appellant at 18. This argument is stronger if we assume that the entirely unknown person gave Dr. Tonsey

2. There is a conflict in the testimony regarding whether appellant delivered the note to Dr. Tonsey's assistant, R. 2.108, or to George R. Pester, who was Assistant Personnel Manager of The Budd Company, R. 2.152, but this conflict makes no difference in light of the fact that Dr. Tonsey received the note. R. 2.152.

incorrect information—that is, said that appellant was taking Thorazine.

In any event, Dr. Tonsey told George R. Pester, who was Assistant Personnel Manager of The Budd Company, that appellant was taking the medications listed on Dr. Tobe's note and that it would be unsafe to continue his employment. R. 2.85; 2.152. On the strength of this recommendation, appellant was discharged on October 17, 1975. R. 2.85; 3.4.

As we have just indicated, one of appellant's arguments is that Dr. Tonsey should not have relied upon information from an unidentified source that appellant was taking Thorazine. This argument might have force if the information that appellant was taking Thorazine had been the sole basis of Dr. Tonsey's recommendation that appellant be discharged. But, even giving appellant the benefit of every favorable inference, *Scott v. Purcell, supra,* it is clear that this information was not the sole basis of Dr. Tonsey's recommendation.

■ If we assume that Dr. Tonsey was told, incorrectly, that appellant was taking Thorazine—and we have discussed the testimony bearing on this assumption—then it is arguable that this information was *part of* the basis of Dr. Tonsey's recommendation that appellant be discharged. But it was not an important, or operative, part. For with or without it, the recommendation would have been the same. The urinalysis disclosing Darvon in appellant's system alerted Dr. Tonsey to the possibility that appellant was taking medication. That possibility was then confirmed in fact, in Dr. Tonsey's mind, by the note from appellant's own doctor, Dr. Tobe, stating "Meds. taken: Elavil 50 mg. Valium 10 mg. Darvoset N 100 mg. 1 prescription Biphetamine July, 1975." Dr. Tonsey testified generally that "any one" of these medications "is too dangerous for anybody working in Budd Company which employs a lot of fast-moving big presses and moving machinery." R. 3.10. He was specifically asked about the dangers posed by Elavil and Valium, and explained that the most common problem was that they

caused "a lack of coordination. Sometimes you get dizzy, you could pass out." R. 3.10; 3.11–16. This testimony was not only not contradicted but was substantiated by Dr. Tobe's testimony. R. 2.13–15; 2.31–38; 2.43; 2.53; 2.62; 2.65–67. Thus, even if the unknown person at the Erie Medical Center did tell Dr. Tonsey that appellant was taking Thorazine, that information in no way undermined the information in Dr. Tobe's note that appellant was also taking other medications, which by themselves rendered appellant unfit for employment on the assembly line.

■ Appellant next argues, however, that Dr. Tonsey should not have concluded on the basis of Dr. Tobe's note that appellant was taking the medications listed on the note. According to appellant, the information on the note was correct as of July 1975 but not as of October 1975, when Dr. Tobe wrote it. In appellant's view, Dr. Tonsey should have understood from the note that its information was only as of July 1975. This argument lacks merit.

In the first place, it is by no means clear that the information on the note was incorrect. It is true that Dr. Tobe testified that the last time he treated appellant was July 10, 1975, R. 2.11, and that the last line of the note was, "One prescription of Biphetamine July, 1975." But it does not follow from this evidence that the information on the note was correct only as of July 1975 and incorrect as of any later date. Although there was a limiting qualification as regards Biphetamine ("July, 1975"), there was no such qualification as regards the other medications. Furthermore, Dr. Tobe testified that when appellant asked him for the note, in October 1975, "my understanding of the note was that he needed it, they [The Budd Company] wanted to know *what medicines he was taking*, period." R. 2.74 (emphasis added). Thus, when Dr. Tobe wrote the note, he believed that he was describing appellant's medications not as of July but as of October 1975.

To be sure, appellant testified otherwise. Specifically, when asked, "Were you taking drugs during the time you were employed by the Budd Company?" he replied, "No." R. 2.138. But this testimony could not, even on the most

favorable view, have been accepted by a jury as credible, for it was too thoroughly contradicted by other testimony—all presented by appellant's own witnesses. Not only was there the urinanalysis, but Dr. Tobe testified, without contradiction, that appellant's medical chart at the Erie Medical Center showed that on August 1, 1975, appellant was given a prescription for Biphetamine sufficient to last until September 1, 1975, R. 2.61–62; that on November 11, 1975, he was given another; and that on November 21, 1975, there was a notation that appellant apparently had become addicted, R. 2.65.

But even if we assume that appellant was not under at least some medication in October 1975, and that Dr. Tobe's note was incorrect, still appellant's argument fails. For appellant offered no evidence suggesting that Dr. Tonsey should have known that Dr. Tobe's note was incorrect. Alerted by the urinalysis, Dr. Tonsey had asked appellant for a note describing what kind of medication he was taking, and appellant responded by delivering Dr. Tobe's note. Appellant did not tell Dr. Tonsey that Dr. Tobe's note was incorrect. R. 2.110. What appellant's argument comes down to is an assertion that Dr. Tonsey was negligent in not discovering that an impression that appellant himself created was incorrect.

■ Appellant finally argues that Dr. Tonsey should have inquired whether appellant in fact suffered from the side-effects typically associated with the drugs listed in Dr. Tobe's note. It is true that Dr. Tobe testified that some people differ in their reaction to Valium, Elavil, and Biphetamine, whether taken alone or in combination, R. 2.62, and that appellant did not suffer the typical adverse side effects of these medications. R. 2.15. But that testimony could not support a finding of negligence.

Dr. Tonsey testified that the policy of The Budd Company was "not to let anybody work in the press area or in the production area with any of the medication he [appellant] has been taking." R. 3.10. Perhaps the company might have adopted an individualized policy, deciding that a given individual would or would not be permitted to work in the

production area depending upon what his doctor said about his reaction to medication. Instead, as shown by Dr. Tonsey's testimony, the company adopted a general policy without providing for individualized exceptions. Appellant offered no evidence that this policy was in some way unwarranted, and that in implementing it, Dr. Tonsey was acting improperly.

AFFIRMED.

WIEAND, J., files a concurring opinion.

WIEAND, Judge, concurring:

I join my colleagues in holding that the plaintiff-appellant failed to prove negligence on the part of the physician who, as medical director of appellant's employer, recommended that appellant be discharged because his ability to perform the duties of his employment had been impaired by the use of drugs. This holding, it will be observed, assumes that a physician who contracts with an employer to examine an employee for purposes of continued employment owes to the employee a duty to exercise due care. However, we have not attempted to define the nature or scope of the duty owed to such an examinee and have not held the duty co-extensive with that which is owed where the doctor-patient relationship does in fact exist. See: Annotation of cases at 10 A.L.R.3d 1871.